# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RAFAEL LIMA, et al,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **1:20-cv-00598-TFM-N** |
| **RANGER ENVIRONMENTAL** | ) | |
| **SERVICES, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<br/>

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO CONDITIONALLY CERTIFY COLLECTIVE ACTION CLASSES AND TO FACILITATE NOTICE UNDER 29 U.S.C. § 216(b)

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 1

ARGUMENT ........................................................................................................................ 4

    I.    Plaintiffs have failed to meet their burden of proving that conditional certification is warranted ....................................................................................................................... 4

        A.    Plaintiffs have failed to meet their burden of proving that others desire to join this lawsuit .......................................................................................... 5

        B.    Plaintiffs have failed to prove that there is a similarly situated group of individuals with respect to the alleged straight time for overtime collective  8

                1.    Plaintiffs have failed to show that Ranger has a policy or practice of paying straight time for overtime .................................................... 10

                2.    The mere allegation of occasional payroll errors is insufficient to prove that Ranger had a policy or practice of paying straight time for overtime ..................................................................................................... 13

                3.    Plaintiffs have failed to present evidence of any alleged incidents of "straight time for overtime" outside of Ranger's Birmingham location .................................................................................................... 17

        C.    Plaintiffs have failed to prove that there is a similarly situated group of individuals with respect to the alleged unlawful deductions collective ....... 19

                1.    There is no evidence that Plaintiffs or any similarly situated individuals were subject to a common policy of unlawful deductions that caused overtime violations .......................................................... 19

                2.    Plaintiffs have failed to prove that they are similarly situated to the members of the alleged unlawful deductions class. ......................... 24

    II.    The collectives proposed by Plaintiffs are overbroad ............................................. 25

        A.    The classes are overbroad because they include individuals whose claims are time-barred. ..................................................................................... 25

        B.    The proposed collectives are overbroad because they include individuals with jobs different than Plaintiffs ............................................................... 26

    III.    Notice should not be issued to individuals who signed arbitration agreements during their employment with Ranger ...................................................................................... 27

    IV.    Any opt-in period should be limited to 60 days ...................................................... 30

    V.    Plaintiffs have failed to provide a proposed notice form to be sent to members of the proposed collectives ............................................................................................... 30

## INTRODUCTION

Plaintiffs' request for conditional certification of a collective action under the Section 216(b) of the FLSA should be rejected. First, Plaintiffs have failed to prove that other similarly situated employees desire to opt-in to either of the proposed collectives. Second, with respect to the alleged "straight time for overtime" collective, certification is inappropriate because the evidence shows that Ranger did not have a policy or practice of paying for missed hours at a straight time rate. Third, as for the purported "unlawful deductions" collective, Plaintiffs have failed to identify any policy that violates the FLSA as the deductions at issue did not reduce any overtime payments to Plaintiffs. Lastly, as explained herein, the collectives proposed by Plaintiffs lack any common issues of law or fact and would involve individualized inquiries that make this case ill-suited for collective adjudication. As such, given that Plaintiffs have failed to meet their burden of proving that collective treatment is merited, this Court should exercise its discretion and deny conditional certification.

## FACTUAL BACKGROUND

Defendant Ranger Environmental Services, LLC ("Ranger" or "Defendant") is a family-owned industrial cleaning and environmental services company based out of Creola, Alabama, with branch offices in Birmingham and Decatur. (Declaration of Elena Turner ("Turner Dec."), attached hereto as Exhibit A, at ¶ 2.) Ranger opened its Birmingham office in November 2019. (*Id.*) Plaintiffs Rafael Lima ("Lima") and Javier Grace ("Grace")—who are father and son—were hired to work at the Birmingham office in early December 2019. (*Id.* at ¶ 3.) Lima was hired as a Field Supervisor, and Grace was hired as a Field Technician. (*Id.*) In these positions, Plaintiffs sometimes worked at the Birmingham office performing shop work, and sometimes performed environmental clean-up field work at the facilities of Ranger's clients. (*Id.*) During their

1

employment with Ranger, Lima was paid at the rate of $22.5/hour for all straight time work (*i.e.*, work up to 40 hours in a workweek), and Grace was paid at the rate of $16/hour for all straight time work. (*Id.* at ¶ 4.) Both Lima and Grace were paid at time-and-a-half of their regular rate of pay for any overtime work (*i.e.*, work over 40 hours in a workweek). (*Id.*)

At the beginning of their employment with Ranger, Plaintiffs received and acknowledged in writing their acceptance of the terms of Ranger's Employee Handbook. (Deposition of Rafael Lima ("Lima Dep."), attached hereto as Exhibit B, at 19:3-19; Exs. 3 & 4 to Lima Dep; Deposition of Javier Grace ("Grace Dep."), attached hereto as Exhibit C, at 21:8 to 22:9; Ex. 17 to Grace Dep.) The Employee Handbook includes policies relating to uniforms and the employee escrow account. (Ex. 5 to Turner Dec.) With respect to uniforms, the Handbook includes a policy making clear that employees will be responsible for a portion of the cost of uniforms provided to them by Ranger and listing the costs of the uniforms. (*Id.*) In March 2020, Ranger implemented a new uniform policy that Plaintiffs received and acknowledged in writing. (Turner Dec. at ¶ 8; Lima Dep. at 100:1-14; Ex. 14 to Lima Dep.; Grace Dep. at 79:23 to 80:10; Ex. 21 to Grace Dep.) Under the new policy, employees were provided with multiple sets of new uniforms to wear to work that Ranger rented from a third-party provider. (*Id.*; Lima Dep. at 101:12-21.) The new policy expressly authorized Ranger to make weekly deductions of either $10 or $13 from each employee's pay to cover the costs of providing the rented uniforms. (Ex. 14 to Lima Dep.) The amount deducted reflected the actual cost to Ranger of providing the uniforms to the employees. (Turner Dec. at ¶ 8.)

The Handbook also contains an Employee Escrow Account Policy explaining that $15/week will be deducted from the pay of new employees during the first year of their

employment and placed in an escrow account until a total of $500 is deposited. (Turner Dec. at ¶ 9, Ex. 5 to Turner Dec.) The policy further explains that escrow account deductions are necessary to cover the cost of providing necessary training[1] and certifications to new employees. (*Id.*) For employees who leave their employment with Ranger before their one-year anniversary date, the policy explains that the funds in the escrow account will be used to cover the costs incurred by Ranger in providing the training and certifications.[2] (*Id.*) Both Plaintiffs agreed to the Escrow Account Policy in writing at the beginning of their employment. (Lima Dep. at 19:20 to 20:19; Grace Dep. at 22:10 to 23:4.)

As reflected in the time recording policy in the Employee Handbook, Ranger's standard method of recording employee time is through an electronic time clock system. (Turner Dec. at ¶ 11; Ex. 6 to Turner Dec.) However, the electronic time clock system had not been installed at the Birmingham office during the period of Plaintiffs' employment. (*Id.*) As such, Plaintiffs and other employees in the Birmingham office used paper time sheets to record their work time. (*Id.*) As Ranger keeps track of billable time *(i.e.*, work that Ranger can bill to its clients) versus non-billable time, Plaintiffs' work time was also recorded on field tickets (for billable work) and shop tickets (for non-billable work). (*Id.*) The time sheets, field tickets, and shop tickets were sent to Ranger's payroll department in Creola where the time was entered into the payroll system. (*Id.*) Since

---

[1] The training that Plaintiffs received was provided by a third-party entity called TVTC Safety Training Centers ("TVTC"). (Turner Dec. at ¶ 10.) Employees receive safety training from TVTC, including various specific training courses that are required by Ranger's clients to obtain certifications to work at the clients' facilities. (*Id.*; Lima Dep. at 105:11-20; Grace Dep. at 83:12 to 84:19.) The employees retain the certifications even if they leave their employment with Ranger. (Turner Dec. at ¶ 10.) Ranger pays for the training provided by TVTC. (*Id.*)

[2] If an employee remains employed by Ranger for more than one year, the amount in that employee's escrow account is refunded to the employee at termination and he or she is not responsible for any of the costs of the training/certifications. (Turner Dec. at ¶ 9.)

Birmingham employees used time sheets, the personnel in the payroll department entered the time reflected on the time sheets into the payroll system. (*Id.*) However, as employees' paystubs include a breakdown of field time and shop time, the field and shop tickets are used to determine the breakdown of billable versus non-billable hours.[3] (*Id.*)

On certain occasions during their employment, Plaintiffs reported to the Branch Manager of the Birmingham office that they believed hours were missing from their pay. (Lima Dep. at 42:16-19; Grace Dep. at 36:14 to 37:3.) When Ranger management confirmed that additional hours should have been included in Plaintiffs' pay, Ranger issued a supplemental payment to Plaintiffs. (Turner Dec. ¶ 13.) If the additional hours were in whole or part overtime hours, the supplemental payment included overtime payments. (*Id.*) At no time were Plaintiffs paid straight time for overtime. (*Id.*) Plaintiffs' bank records confirm that the net payment amounts reflected on Plaintiffs' paystubs were direct deposited into Plaintiffs' bank accounts by Ranger.[4] (Records from Wells Fargo Bank, pertinent portions of which are attached hereto as Exhibit D; Records for Green Dot Bank, pertinent portions of which are attached hereto as Exhibit E.)

## ARGUMENT

**I.     Plaintiffs have failed to meet their burden of proving that conditional certification is warranted.**

District courts "have discretion, in *appropriate* cases," to conditionally certify a collective

---

[3] The time sheets do not differentiate between field and shop time**.** (Turner Dec. at ¶ 11 n.1.)

[4] On one occasion, the amount deposited by Ranger into Lima's bank account exceeded the amount reflected on his pay stub. Specifically, for the supplemental overtime payment issued for the pay period ending on February 3, 2020, Lima's pay stub reflects a net payment of $362.90 but his bank records show that $444.20 was deposited. (*See* Ex. 3 to Turner Dec. at 13 and Ex. D.) This overpayment of wages appears to be the result of a data entry error by Ranger in entering the amount of the deposit.

action under Section 216(b) of the FLSA if doing so would permit the "efficient resolution in one proceeding of common issues of law and fact arising from *the same alleged . . . activity*." *Hoffman-La Roche, Inc. v. Sterling*, 493 U.S. 165, 169-70 (1989) (emphasis added). The Eleventh Circuit has held that plaintiffs seeking conditional certification must establish that (1) there are other employees of the defendant-employer who desire to opt-in; and (2) that those employees are "similarly situated" to the plaintiffs with respect to their job requirements and with regard to their pay provisions. *See Dybach v. Fla. Dep't of Corrs.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991). Plaintiffs bear the burden of proof with respect to both requirements. *Grayson v. K-mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996). This preliminary inquiry is necessary because "courts, as well as practicing attorneys, have a responsibility to avoid the '*stirring up*' of litigation through unwarranted solicitation." *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1318 (M.D. Ala. 2002) (quoting *Brooks v. BellSouth Telecomms.*, 164 F.R.D. 561, 567 (N.D. Ala. 1995)) (emphasis added). Indeed, "an employer should not be unduly burdened by a frivolous fishing expedition conducted by plaintiff at the employer's expense." *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995).

A.     **Plaintiffs have failed to meet their burden of proving that others desire to join this lawsuit.**

The law is clear that Plaintiffs must provide evidence to satisfy the Court that "there are other employees . . . who desire to 'opt-in [to the action].'" *Dybach*, 942 F.2d at 1567-68. "The onus is on the plaintiff[s] to demonstrate a reasonable basis for the assertion that other employees desire to opt-in." *Leo v. Sarasota Cnty. Sch. Sys.*, No. 8:16-cv-3190, 2017 WL 477721, at *2 (M.D. Fla. Feb. 6, 2017) (citing *Haynes v. Singer Co.*, 696 F.2d 884, 887 (11th Cir. 1983)). Merely alleging that the purported FLSA violations were widespread and that additional plaintiffs will

come forward is not sufficient to meet this burden. *Haynes*, 696 F.2d at 887.

Plaintiffs have not identified a single person who desires to join this action. There are no opt-in plaintiffs[5] in this case and Plaintiffs have not identified anyone who wants to join this case. Indeed, at their depositions, Plaintiffs candidly admitted that they are not aware of anyone who wants to join this lawsuit. (Lima Dep. at 131:20-22, Grace Dep. at 111:10-12.) This failure to prove sufficient interest by others is fatal to Plaintiffs' motion for conditional certification. "Where plaintiffs fail to produce evidence demonstrating that any prospective class member would opt into the litigation, courts have routinely declined to certify a collective action and authorize notice." *Barrera v. Oficina, Inc.*, No. 10-21382, 2010 WL 4384212, at *3 (S.D. Fla. Oct. 28, 2010) (listing cases); *see also Harapeti v. CBS Television Stations*, No. 20-cv-22995, 2021 WL 413773, at *4 (S.D. Fla. Jan. 20, 2021) (denying conditional certification where "Plaintiff did not put forth a single declaration or affidavit by any employee, other than herself, who seeks to join the lawsuit"); *Valentin v. Goodfellows of Pasco Cnty.*, No. 8:21-cv-190, 2021 WL 1388651, at *3 (M.D. Fla.

---

[5] Earlier in this case, two individuals filed opt-in notices but then subsequently withdrew their notices. Based on their request to withdraw, the Court dismissed those individuals without prejudice. (Docs. 34 & 36.) Those withdrawn notices from several months ago do nothing to prove that there are specifically identifiable individuals who *currently* want to join this case. *See Ramirez v. Urban Outfitters, Inc.*, No. 6:13-cv-1074, 2014 WL 12573981, at *2-3 (M.D. Fla. Apr. 22, 2014) (declining to consider opt-in plaintiff who was no longer participating in the case). Moreover, even if the two withdrawn and dismissed opt-ins could somehow be considered, courts have found that only two opt-ins are insufficient to prove that other individuals desire to join a putative collective action. *See, e.g., Robinson v. Dolencorp., Inc.*, No. 06-122, 2006 WL 3360944 at *4-5 (M.D. Fla. Nov. 13, 2006) (finding consents to join from two employees other than plaintiff to be insufficient to establish that others desire to opt-in); *White v. KCPAR, Inc.*, No. 05-1317, 2006 WL 1722348 at *3 (M.D. Fla. June 20, 2006) (same); *Rodgers v. CVS Phar., Inc.*, No. 05-770, 2006 WL 752831 at *4 (M.D. Fla. Mar. 23, 2006) (same)*; see also Wombles v. Title Max of Ala., Inc.*, No. 03-1158, 2005 WL 3312670 at *3 (M.D. Ala. Dec. 7, 2005) (two consents to join and five nearly identical affidavits by plaintiffs indicating that they "believe" others desire to join the lawsuit were insufficient to establish that others desire to opt in).

Apr. 13, 2021) (finding that plaintiffs' failure to prove that "other individuals, who are not already party to this suit, are interested in opting-in" required denial of motion for conditional certification); *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1277 (M.D. Ala. 2004) ("[P]laintiffs have filed no affidavits or consents from these would-be class members to suggest that they are actually willing to join the suit . . . Thus, the court concludes that plaintiffs have not carried their burden of demonstrating that other plaintiffs exist who desire to opt-in.").

Rather than making the required showing that other individuals wish to opt-in to this case, Plaintiffs merely argue that it is "likely" that others will wish to assert their rights if notices are sent out. (Doc. 46 at 510.) In essence, Plaintiffs seek the issuance of notice to a broad class of current and former Ranger employees to determine *if* there are others who desire to join this case. However, "[c]ertification of a collective action and notice to a potential class is not appropriate to determine *whether* there are others who desire to join the lawsuit." *Vondriska v. Premier Mort. Funding, Inc.*, 564 F. Supp. 2d 1330, 1334 (M.D. Fla. 2007) (emphasis in original). Rather, "a showing that others desire to opt-in is required **before** certification and notice will be authorized by the court." *Id.* (emphasis added). "Were it otherwise, court-authorized notice would function as little more than a fishing expedition." *Zulani v. Santa Ana, LLC*, No. 17-62080-CIV, 2018 WL 1894723, at *5 (S.D. Fla. Mar. 14, 2018).

While Plaintiffs' counsel may believe that others may join this action if notices were issued, the courts have made clear that a "mere stated belief in the existence of other employees who desire to opt-in is insufficient" to justify conditional certification. *Davis*, 303 F. Supp. 2d at 1277; *see also Valentin*, 2021 WL 1388651, at *3 (stating that "Plaintiffs unsupported expectations that additional plaintiffs will subsequently come forward are insufficient to justify notice"). Similarly,

7

the bare assertion that other employees subject to similar policies exist, "does not provide a reasonable basis for the Court to conclude that those [employee] desire to join the instant litigation." *Valentin*, 2021 WL 1388651 at *3 (citation and quotations omitted); *Zuliani*, 2018 WL 1894723 at *3 (stating that "the mere presence of a uniformly adverse compensation policy is insufficient by itself" to show that "other individuals actually desire to opt-in to the litigation"). Simply put, the speculative belief that others might wish to opt-in if notice is issued is grossly insufficient to justify the certification of a collective action and issuance of notice to a class. *See Ramirez*, 2014 WL 12573981, at *3; *Palacios v. Boehringer Ingelheim Pharm., Inc.*, 2011 WL 6794438, at *5 (S.D. Fla. Apr. 19, 2011) (stating that assertions based on "beliefs" and are conclusory and insufficient).

"The Plaintiffs have presented no evidence of any individual's interest in joining this lawsuit, and absent a showing [that] there are similarly situated employees who would opt-in, there is no evidentiary basis to permit this matter to go forward as a collective action." *Barrera*, 2010 WL 4384212, at *3. Given that Plaintiffs have failed to prove that others desire to join the litigation, Plaintiffs' Motion should be denied on that basis alone.

**B.    Plaintiffs have failed to prove that there is a similarly situated group of individuals with respect to the alleged straight time for overtime collective.**

Plaintiffs have also failed to establish that they are similarly situated with the putative collective and that the putative collective itself is comprised of similarly situated employees. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1258 (11th Cir. 2008). Indeed, "[t]he key to starting the motors of a collective action is a showing that there is a similarly situated group of employees." *Id.* at 1260. Plaintiffs must demonstrate that there are other employees who are "similarly situated" with respect to "their job requirements and with regard to their pay

8

provisions." *Id.* at 1259 (quoting *Grayson*, 79 F.3d at 1096). As the Eleventh Circuit has made clear, Plaintiffs must make "**substantial**" and "**detailed**" allegations supported by evidence to satisfy the "similarly situated" element. *Grayson*, 79 F.3d at 1097.

With respect to the alleged "straight time for overtime class," Plaintiffs have failed to meet their burden because there is no evidence of any Ranger employees (other than Plaintiffs) who have any dispute with the amount paid to them for any "missing or uncounted hours." Specifically, Plaintiffs have not provided any testimony to show that any other employee contends that he or she was paid straight time for overtime for missing or uncounted hours.[6] As such, Plaintiffs have failed to prove that there are any employees similarly situated to them "with regard to their pay provisions." *Morgan*, 551 F.3d at 1259. Accordingly, in light of this absence of proof, conditional certification should be denied.

Moreover, there is no evidence that Ranger had any policy, pattern, or practice of paying straight time for overtime. Because judicial economy is a primary concern of any class litigation, the presence of a uniform policy or plan affecting the individuals in the proposed class is often required for notice. *See Marsh v. Butler Cnty. Sch. Sys.*, 242 F. Supp. 2d 1086, 1094 (M.D. Ala. 2003) (stating that a plaintiff must demonstrate a "pattern" of FLSA violations that "stem from [defendant's] formal or informal policy"); *White*, 204 F. Supp. 2d at 1313 (noting that some courts have held that "members of a proposed class were not similarly situated where the supposedly unlawful activities of the employer were not shown to be pursuant to a common scheme, plan, or policy"); *see also Wallace v. Norcross Assocs.*, No. 1:13-cv-1349, 2014 WL 1373659, at *4 (N.D.

---

[6] While Plaintiffs may contend that other unidentified Ranger employees had problems with their pay or had missing hours, Plaintiffs' have failed to provide evidence that any specifically identifiable individual contends that he or she was paid straight time for overtime for missing or uncounted hours, which is the class of employees for which Plaintiffs seek certification.

Ga. Apr. 8, 2014) (denying conditional certification where "Plaintiffs have not shown that Defendants adopted a common policy or practice that violates the FLSA,"). Even if the presence of a common policy is not a *per se* requirement, it is relevant to the Court's exercise of its discretion on the question of certification. As noted by one district court:

> Although, the existence of a common policy or plan is not a mandatory requirement in the Eleventh Circuit for conditional certification, nonetheless, the existence of a common policy or plan is relevant to the Court's exercise of its discretion in granting conditional certification because the underlying rationale for granting a collective action is to preserve judicial economy. . . [W]here a collective action would not serve the interests of judicial economy, plaintiffs should not be permitted to request court-supervised notice as a tool for drumming up business.

*Robinson*, 2006 WL 3360944 at *6.

"[A] plaintiff must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions." *White*, 204 F. Supp. 2d at 1314. Put differently, "some identifiable facts or legal nexus must bind the claims so that hearing the cases together promotes judicial efficiency." *Barron v. Henry Cnty. Sch. Sys.*, 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003). "Without such a requirement, it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." *White*, 204 F. Supp. 2d at 1314.

### 1.    Plaintiffs have failed to show that Ranger has a policy or practice of paying straight time for overtime.

As an initial matter, Plaintiffs are not alleging that they were never paid overtime during their employment with Ranger. Indeed, Plaintiffs admit (and their payroll records confirm) that Plaintiffs were paid overtime compensation by Ranger. (Lima Dep. at 61: 20 to 62:1; Exs. 3 & 4 to Turner Dec.) Rather, Plaintiffs' Complaint defines the supposed "straight time for overtime class" as those employees who worked more than 40 hours per week but were not paid for any

"missing or uncounted hours" at their overtime rate of pay. (Doc. 47 at 631.) This alleged class arises out of the allegation in the Complaint that Plaintiffs, when they complained to Ranger about missing hours in their pay, would be issued a supplemental payment by Ranger but "*only at their straight time rate of pay for these hours.*" (*Id.* at 627, 628-29) (emphasis added). Both Plaintiffs testified that they complained to Ranger on each and every occasion in which they contend hours were missing from their paychecks, and that Ranger issued them a supplemental payment for additional hours on each and every occasion that they had hours missing from their pay. (Lima Dep. at 42:16-19, 82:5-8; Grace Dep. at 36:14 to 37:3, 53:11-13.) The payroll records and Plaintiffs' testimony confirm that some of the supplemental payments included payment for hours at Plaintiffs' overtime rate. (Exs. 3 & 4 to Turner Dec.; Lima Dep. at 82:5 to 83:16; Grace Dep. at 64:14-22.) Specifically, Plaintiffs were issued supplemental payments that included pay at their overtime rate on the following occasions:

**Rafael Lima**

| Pay Period Ending | Number of Overtime Hours Paid in Supplemental Payment | Gross Amount of Supplemental Overtime Payment |
|---|---|---|
| 1/13/20 | 11.5 | $388.13 |
| 2/3/20 | 12 | $405 |
| 2/24/20 | 5 | $168.75 |
| 3/2/20 | 7.5 | $253.13 |
| 5/4/20 | 12.5 | $421.88 |

**Javier Grace**

| Pay Period Ending | Number of Overtime Hours Paid in Supplemental | Gross Amount of Supplemental Overtime |
|---|---|---|

|  | Payment | Payment |
|---|---|---|
| 12/23/19 | 18.75 | $450 |
| 1/13/20 | 11.5 | $276 |
| 2/3/20 | 8 | $192 |
| 2/24/20 | 2.5 | $60 |

(Ex. 3 to Turner Dec. at 9, 13, 16, 19 & 30 & Ex. 4 to Tuner Dec. at 5, 9, 13, & 16.) As such, the evidence and Plaintiffs' testimony flatly contradicts any suggestion that Ranger had a policy or practice of only paying for missing or uncounted hours at a straight time rate. To the contrary, the evidence shows that the supplemental payments for missing or uncounted hours often included overtime pay.

Given that Plaintiffs regularly received payments for missing or uncounted hours at their overtime rate of pay, there is no evidence of any policy or practice of only paying straight time for overtime for missing or uncounted hours, contrary to the allegations in the Complaint.[7] *See Thedford v. Drive In of Evansville, Inc.*, No. 2:14-cv-390, 2014 WL 5520954, at *10 (N.D. Ala. Oct. 31, 2014) (denying conditional certification where plaintiff failed to prove that alleged FLSA

---

[7] Even if Ranger had a policy of only paying straight time for overtime for missing or uncounted hours, which it did not, the policy was clearly not followed. A collective action cannot be certified on the basis of an alleged companywide policy if the evidence shows that the alleged policy was not uniformly followed. *See Fox v. Tyson,* 519 F.3d 1298, 1302 (11th Cir. 2008) (finding that district court in denying a motion for conditional certification did not err in finding that a chicken processing company did not have a "single, company-wide policy about compensation for donning and doffing" where the compensation employees received for donning and doffing varied both among and within the company's plants); *see also Hilley v. Tacala, LLC*, No. 2:12-cv-2691, 2014 WL 1246364, at *20 (N.D. Ala. Mar. 24, 2017) (evidence showing only sporadic incidents of unpaid time was not sufficient to show "a systemic policy, practice, or pattern of unpaid time or a common nexus between [plaintiff's] claims and the claims of the members of the proposed collective action such that all claims could be efficiently decided in a single action").

violations resulted from companywide policy); *Beecher v. Steak N Shake Operations, Inc.*, 904 F. Supp. 2d 1289, 1299 (N.D. Ga. 2012) ("[B]ecause of the failure to identify a nationwide policy or commonality among the proposed class members, the Court concludes Plaintiffs have failed to show Plaintiffs and the potential class members are similarly situated."). Rather, the evidence shows that Plaintiffs were issued supplemental payments when they complained about missing or uncounted hours and that those payments sometimes included payments calculated at Plaintiffs' overtime rate of pay. Accordingly, Plaintiffs' have failed to prove that they are similarly situated to the proposed collective.

2. **The mere allegation of occasional payroll errors is insufficient to prove that Ranger had a policy or practice of paying straight time for overtime.**

Apparently recognizing that the allegations in the Complaint are wrong as Plaintiffs did receive overtime payments for "missing or uncounted hours," Plaintiffs' brief, in an attempt to distract from the lack of evidence of any policy or practice that violates the FLSA, focuses on the paperwork that was used at Ranger's Birmingham office to record time. Specifically, Plaintiffs' brief states that it "appears" that it was Ranger's practice to base employee pay off of shop or field tickets instead of time sheets. (Doc. 46 at 505.) The brief further alleges that the shop and field tickets "would not necessarily capture all of a worker's time." (*Id.*) However, there is no evidentiary support for either of these allegations. In fact, the allegations are simply false.

While Plaintiffs cite to the testimony of Ford Wyatt (the first Branch Manager for the Birmingham office) to support their allegations regarding Ranger's payroll practices, Mr. Wyatt's testimony does not support Plaintiffs' allegations. Mr. Wyatt never testified that Ranger failed to base employee pay on the hours reflected in the timesheets. Rather, Mr. Wyatt testified that he has

no knowledge of how time was entered by Ranger's payroll department. (Deposition of Ford Wyatt ("Wyatt Dep."), attached hereto as Exhibit F, at 123:13-20; Declaration of Ford Wyatt ("Wyatt Dec."), attached hereto as Exhibit G, at ¶ 4.) Mr. Wyatt (who was located in Birmingham) sent employee time records (including time sheets, shop tickets, and field tickets) by e-mail to Ranger's payroll department in the company's corporate office in Creola, Alabama. (Wyatt Dep at 98:23 to 99:9.) It was then the payroll department's responsibility to process the payroll. (*Id.*) Mr. Wyatt made clear that he was not present when the payroll was being entered at the corporate office and testified that has no knowledge of what documents the payroll department used to enter the payroll.[8] (*Id.* at 123:9-15, 181:13-16; Wyatt Dec. at ¶ 4.) Moreover, the evidence shows that the payroll department did utilize time sheets when entering payroll for the Birmingham office. [9] (Turner Dec. at ¶ 11.)

---

[8] In their brief, Plaintiffs cite to a portion of Mr. Wyatt's testimony when he was discussing an email exchange with Ranger's payroll department that included an incomplete, cut-off image of one screen from Ranger's payroll entry system. (Wyatt Dep. at 179:8 to 181:21; Doc. 46 at 589.) In explaining that he did not have any knowledge of the process used by the payroll department for entering employee time, Mr. Wyatt acknowledged that he did not see anything on the partial, cut-off image of the screen to indicate that time sheets were being used. (*Id.*) However, Mr. Wyatt had made clear that he was never present when the payroll department was entering time and testified that he has no knowledge of what documents the payroll department used to enter employee time. (Wyatt Dec. at ¶ 4). Moreover, the evidence shows that Ranger's payroll entry system has multiple data entry screens. (Turner Dec. at ¶ 11.)

[9] Mr. Wyatt also never testified that shop and field tickets did not record all hours worked. Rather, he merely testified that shop tickets were used to record non-billable time, and field tickets were used to record billable time. (Wyatt Dep. at 101:15-20.) The time sheet was a third document that recorded both the billable and non-billable time for a day. (*Id.* at 101:10-14; Wyatt Dec. at ¶ 3.) Because each employee's paystub included a breakdown of billable field time and non-billable shop time, the payroll department used the field and shop tickets to provide the breakdown of billable and non-billable time. (*Id.*) This was necessary because the timesheets merely recorded total hours worked without differentiating between field and shop time. (*Id.*) However, there is no evidentiary support for any suggestion that the time sheets were not used in entering the payroll.

Plaintiffs' brief also falsely suggests that Mr. Wyatt testified that Ranger had a company-wide policy of paying straight-time for overtime. Mr. Wyatt never testified to any such thing. To the contrary, Mr. Wyatt testified that he is not aware of any Ranger employee being paid straight time for overtime. (Wyatt Dep. at 121:20 to 122:1; Wyatt Dec. at ¶ 5.) While Mr. Wyatt acknowledged that some employees occasionally complained to him about missing hours from their pay,[10] he explained that whenever an employee made such a complaint that he would sit down with the employee to review the time keeping records (time sheets, field tickets, and shop tickets) and reconcile the hours reflected on the time records with the hours reflected on the employee's pay stub. (*Id.* at 118:1 to 119.) If that process showed that the employee had been shorted hours, Mr. Wyatt would notify the corporate payroll office of the need to issue a supplemental payment to the employee, and the supplemental payment would then be made either by direct deposit or Mr. Wyatt writing a check to the employee. (*Id.* at 118:18 to 119:15; 120:17 to 121:7.) While Plaintiffs apparently take issue with the amount of some of the supplemental payments, it is undisputed that some of the supplemental payments for missing hours included overtime payments. (Exs. 3 & 4 to Turner Dec.; Grace Dep. 64:14-22.)

Given that Plaintiffs received overtime payments for missing or uncounted hours, Plaintiffs are essentially seeking certification based on alleged random payroll errors. However, "[p]otential payroll errors do not suggest a particular decision, policy, or plan to unlawfully deny overtime." *Eagle v. Freeport-McMoran, Inc.*, No. 2:15-cv-577, 2016 WL 7494278, at *5 (D.N.M. Aug. 3, 2016). Plaintiff Lima candidly admits there was no pattern to the occasions in which he contends

---

[10] Mr. Wyatt made clear that he does not know the cause of any missing hours. (Wyatt Dep. at 112:15-19.)

he was not paid the correct amount of overtime hours, as it appeared to be "random." (Lima Dep. at 84:18 to 85:2.) Although Plaintiff Lima worked for Ranger for many months, he testified that there were only 8 to 9 weeks during his employment when he had a problem with his pay. (*Id.* at 86:12-20.) In fact, despite being provided with a copy of their time and payroll records, neither Plaintiff is able to identify any specific payment for which they contend they were shorted overtime hours, much less identify the amount of overtime hours allegedly shorted. (Lima Dep. at 73:6-11, 83:17-20; 120:18 to 121:1; Grace Dep. at 66:4-18; 102:11-17.) In other words, there is no evidence of any common plan or policy that resulted in the denial of overtime compensation.

Plaintiffs' mere contention that they were shorted overtime payments in unspecified amounts on unspecified occasions for unknown reasons is woefully insufficient to meet their burden of proving that there are other similarly situated employees. As one court explained:

> [T]he mere fact that violations [are alleged to have] occurred cannot be enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without showing that the violations were more than sporadic occurrences. To conclude otherwise, that is, to conclude that it is enough to demonstrate that employees are similarly situated simply to say that they claim violations of the law by the same employer, is to conclude that any time an employer had two or more employees who allegedly were not being paid the overtime they claimed they were due, the employees would be similarly situated and be allowed to proceed with a collective action.

*Marsh*, 242 F. Supp. 2d at 1094. Rather, a plaintiff must demonstrate a "pattern" of FLSA violations that "stem from [defendant's] formal or informal policy." *Id.*; *Layton v. Percepta, LLC*, No. 6:17-cv-1488, 2018 WL 5492850, at *4 (M.D. Fla. Sept. 21, 2018) (finding that "sporadic occurrences" of FLSA violations "would not allow Plaintiff's allegations to be proven through collective proof"). "Where no wide-spread or across-the-board FLSA violations can be pointed to, 'an individualized analysis of the specific . . . overtime violations would be necessitated for each

16

and every member of the collective action.'" *McAnally v. Ala. Plumbing Contractor*, No. 2021 WL 2514169, at *4 (N.D. Ala. Apr. 29, 2021) (quoting *Hilley*, 2014 WL 1246364 at *15-16). However, "such an individualized analysis runs directly counter to the economy of scale envisioned by collective treatment of similarly situated employees under § 216(b) of the FLSA." *Id.* (quoting *Hilley*, 2014 WL 1246364 at *15-16). "These individualized inquiries make the certification of a collective action in this proceeding unwarranted." *Hart v. JPMorgan Chase Bank*, No. 8:12-cv-470, 2012 WL 6196035, at *5 (M.D. Fla. Dec. 12, 2012).

In sum, there is no evidence of any policy or commonality that binds the claims of Plaintiffs and those of the putative "straight time for overtime" collective. Rather, Plaintiffs merely contend that they were sometimes shorted overtime hours for unknown reasons without any connection to any policy or practice. As there are no common issues of fact or law, collective treatment would be wholly unmanageable as liability for each opt-in plaintiff would have to be determined on an employee-by-employee, day-by-day basis. *Ledbetter v. Pruitt Corp.*, No. 5:05-cv-329, 2007 WL 496451, at *5 (M.D. Ga. Feb. 12, 2007). As Plaintiffs have failed to meet their burden of proving that there are similarly situated employees with respect to the alleged straight time for overtime collective, Plaintiffs' Motion for Conditional Certification should be denied.

### 3.   Plaintiffs have failed to present evidence of any alleged incidents of "straight time for overtime" outside of Ranger's Birmingham location.

Plaintiffs' allegations of unspecified issues with their overtime compensation are grossly insufficient to warrant certification of any collective, much less a company-wide collective. Plaintiffs worked at Ranger's Birmingham office, but Ranger has three other locations (Creola, Decatur, and Tuscaloosa[11]). Plaintiffs' testimony regarding their experiences working at the

---

[11] Ranger's Tuscaloosa office closed at the end of 2021.

Birmingham office does not prove that employees who worked at other offices are similarly situated to Plaintiffs. While Ranger's standard method of employee timekeeping is an electronic time clock, the time clock was not installed at the Birmingham office during Plaintiffs' employment. (Turner Dec. at ¶ 11.) Rather, employees at the Birmingham office recorded their time on paper time sheets. There is no evidence that any employees at Ranger's other offices who used the electronic time clock had any issues with being paid straight time for overtime for missing or uncounted hours. The variation in timekeeping methods is further evidence of the lack of any commonality or identifiable factual or legal nexus that binds the claims of the proposed collective. *See Reyes v. Strada Servs., Inc.*, No. 8:21-cv-976, 2021 WL 4427079, at *4 (M.D. Fla. Sept. 27, 2021) (finding that "inconsistency in timekeeping practices implicates individual inquiries that undermine the prudence of collective certification in this matter").

Moreover, there is no basis for certifying a company-wide collective based on the testimony of two plaintiffs who worked at the same location. "A plaintiff must demonstrate that employees outside of the work location for which the plaintiff has provided evidence were similarly affected by alleged work policies in order for the court to certify a collective action which extends beyond the plaintiff's own work location." *Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1235 (M.D. Ala. 2003). Indeed, courts have recognized that the testimony of plaintiffs who worked at a single location are insufficient to justify certification of a wide collective consisting of employees who worked at different locations. *See, e.g.*, *Strickland v. Wyndham Vacation Resorts*, No. 6:13-cv-1000, 2014 WL 12873396, at *11 (M.D. Fla. May 28, 2014); *Harper's v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 363 (M.D. Ala. 1999). As such, Plaintiffs'

request for certification of a company-wide collective should be denied.[12]

### C.   Plaintiffs have failed to prove that there is a similarly situated group of individuals with respect to the alleged unlawful deductions collective.

Plaintiffs have also failed to provide to provide any evidentiary basis for their proposed "unlawful deductions" class. In their Motion, Plaintiffs seek conditional certification of a collective consisting of current and former employees who had allegedly unlawful deductions taken from their pay during weeks when they worked overtime. (Doc. 46 at 499.) In support of this request, Plaintiffs point to the fact that they were subject to Ranger's policy of making deductions for uniforms, training, and certifications from their weekly pay. However, the evidence shows that the deductions that were taken from Plaintiffs' pay did not reduce their overtime compensation, meaning that Plaintiffs were not subject to any policy that violated the FLSA.

### 1.   There is no evidence that Plaintiffs or any similarly situated individuals were subject to a common policy of unlawful deductions that caused overtime violations.

Plaintiffs' argument in support of conditional certification of the supposedly unlawful deductions class relies on the existence of policies of making deductions from employee pay to cover the costs of uniforms and training/certifications. Other than citing to the existence of the deduction policies, Plaintiffs do not provide any evidence that these policies resulted in any employee being denied overtime to which they were entitled. While it is true that the existence of a common policy can be used to show that putative class members are similarly situated, the policy

---

[12] Even if Plaintiffs' evidence was somehow sufficient to warrant certification of a "straight time for overtime" collective, any such collective should be limited to hourly employees who worked at Ranger's Birmingham office. *See, e.g., Monserrate v. Hartford Fire Ins.*, Co., No. 6:14-cv-149, 2015 WL 4068388, at *3 (M.D. Fla. July 2, 2015) (limiting geographic scope of collective to employees who worked at the two store locations at which the plaintiffs worked); *Caini v. Talk of the Town Restaurants, Inc.*, No. 8:14-cv-2197, 2015 WL 226013, at *5 (M.D. Fla. Jan. 16, 2015) (limiting conditional certification to the location at which plaintiffs worked).

at issue must violate the FLSA. *See, e.g., Ledbetter*, 2007 WL 496451 at *4 (denying conditional certification where plaintiff failed to "provide sufficiently detailed evidence establishing that [defendant's] policy of automatic meal deductions resulted in a pattern or practice of FLSA violations"); *Thedford*, 2014 WL 5520954 at *11 (denying conditional certification and noting that even if defendant had the policy alleged by plaintiff that "such a policy does not violate the FLSA"); *Marsh*, 242 F. Supp. 2d at 1094 (stating that a plaintiff must a "pattern" of FLSA violations that "stem from [defendant's] formal or informal policy"). Where the policy at issue is not a *per se* violation of the FLSA, a plaintiff cannot prove the similarly situated requirement by merely citing to the policy. *See Ledbetter*, 2007 496451 at *4 (finding that meal deduction policy was not a *per se* violation of the FLSA and that plaintiff failed to offer evidence that the policy resulted in a pattern and practice of FLSA violations); *Williams*, 2006 WL 2085312 at *4 (denying conditional certifications where "the Plaintiffs have not shown a common policy that violates the FLSA"). Rangers' practice of making deductions for the cost of uniforms and training/certifications is not a *per se* FLSA violation, and Plaintiffs have failed to offer any evidence that the deduction policies resulted in a single FLSA violation with respect to Plaintiffs or anyone else.

As set forth in detail in Defendant's pending Motion for Summary Judgment on Count II of Plaintiffs' Complaint, making deductions for items that primarily benefit the employer (*i.e.,* uniforms, tools, etc.) in a week in which an employee works overtime hours is not an automatic FLSA violation.  While Plaintiffs contend that such deductions constitute illegal kickbacks under 29 C.F.R. § 531.35, the cited regulation by its own terms only applies when a deduction "cuts into the minimum or overtime wages required to be paid [to the employee] under the [FLSA]." 29

C.F.R. § 531.35. As such, "kickbacks are not *per se* illegal, but only when such deductions deprive an employee of the federally mandated minimum wage or overtime." *Cudnik v. W.L. York, Inc.*, No. H-20-2998, 2021 WL 3674972, at *2 (S.D. Tex. Feb. 8, 2021).

The regulations that follow § 531.35 describe the circumstances in which deductions may be made from an employee's pay in both non-overtime and overtime workweeks. For weeks in which an employee works 40 or fewer hours, 29 C.F.R. § 531.36(b) explains that "where an employee is employed at a rate in excess of the applicable minimum wage and during a particular workweek works 40 hours for which the employee receives at least the minimum wage free and clear, the employer having deducted from wages for facilities furnished, whether such deduction meets the requirement of section [203(m)] . . . need not be considered, since the employee is still receiving, after the deduction has been made, a cash wage of at least the minimum wage for each hour worked." *Id.* § 531.36(b). As such, if an employee's regular rate of pay exceeds the applicable minimum wage, the employer may make deductions so long as the employee is still paid at least the minimum wage for each hour worked. *Id.* at 531.36(a); *see also Lira v. Arrow Air, Inc.*, No. 05-23273, 2006 WL 8433511, at *2 (S.D. Fla. Apr. 18, 2006) (finding that deductions for uniforms did not violate the FLSA because the plaintiff's wages were always above the minimum wage for all hours worked).

The regulatory scheme goes on to explain in 29 C.F.R. § 531.37 the manner in which deductions may be made in weeks in which an employee works in excess of 40 hours. Specifically, § 531.37 states:

> It is the Administrator's opinion that deductions may be made . . . on the same basis in an overtime workweek as in non-overtime workweeks (see § 531.36), if their purpose and effect are not to evade the overtime requirements of the Act or other law, providing the amount deducted does not exceed the amount which could be

21

> deducted if the employee had only worked the maximum number of straight-time hours during the workweek. Deductions *in excess of this amount* for such articles as tools and other articles which are not "facilities" within the meaning of the Act are illegal in overtime workweeks as well as in nonovertime workweeks.

29 C.F.R. § 531.37(a) (emphasis added). In other words, even if the deduction is for an item that does not qualify as a "facility" under Section 203(m) and primarily benefits the employer (tools, uniforms, etc.), the employer may make the deduction in an overtime workweek so long as the deduction does not exceed the amount that could be deducted if the employee had only worked 40 hours.

As such, an employer has a right to "make deductions from the straight time portion of the employee's wages as long as those deductions do not bring the employee below the minimum wage. That is, if a worker's straight time salary is more than minimum wage, that 'extra' payment creates, in effect, a buffer for deductions by an employer" even in weeks in which the employee works overtime. *Castillo v. Case Farms of Ohio,* 96 F. Supp. 2d 578, 639-40 (W.D. Tex. 1999).

Plaintiffs' payroll records demonstrate that the deductions for uniforms and training/certifications never reduced their overtime compensation. If Plaintiffs had only been paid the federal minimum wage of $7.25/hour for all straight time hours, they would have only been entitled to gross pay of **$290/week** if they worked 40 hours in a given week ($7.25 x 40 = $290). However, during their employment with Ranger, Plaintiffs' hourly rate of pay was well in excess of the federal minimum wage. Specifically, Plaintiff Lima was paid $22.5/hour and Plaintiff Grace was paid $16/hour for all straight time work (*i.e.* up to 40 hours per week). (Turner Dec. at ¶ 4.) As such, if Lima worked 40 hours in a week, his gross pay was **$900** ($22.5 x 40 = $900), and

Grace's gross pay for working 40 hours in a week was **$640** ($16 x 40 = $640).[13] Therefore, in a week in which Plaintiffs worked 40 hours, Lima's weekly pay exceeded the required minimum by **$610** ($900 - $290 = $610) and Grace's weekly pay exceeded the minimum by **$350** ($640 - $290 = $350). The amount by which Plaintiffs' weekly pay for straight time work exceeded the minimum created a buffer from which deductions could be made without reducing their pay below the minimum wage and without reducing any overtime compensation. *See Castillo*, 96 F. Supp. 2d at 640.

In the payroll records, the weekly deductions for the training/certification costs are labeled "Escrow" and the deductions for uniforms are labeled "UniformsTus." (Turner Dec. at ¶ 5.) Review of the paystubs shows that the combined amount of both deductions never exceeded $50 in any week. (Exs. 3 & 4 to Turner Dec.) Given that Ranger could deduct up to $610 for Lima and $350 for Grace in an overtime workweek, the less than $50 in combined deductions for uniforms and training/certifications did not deprive Plaintiffs of any overtime compensation.[14]  In other words, the deductions were always well below the buffer amounts by which Plaintiffs' straight time wages exceeded the minimum wage. As such, Ranger could make those deductions from Plaintiffs' pay in an overtime week on the same basis as in a non-overtime week.

Simply put, there is no evidence that Ranger had any common policy or practice of taking

---

[13] In the payroll records, straight time hours are reported as field and shop field. Overtime hours are listed separately. (Turner Dec. at ¶ 5.)

[14] In their last week of employment, the amount that had been deducted for the escrow account was credited back to both Plaintiffs and the actual costs of the training/certifications that Ranger provided to Plaintiffs was deducted. When the deduction for the actual costs is offset by the credit of the amount in the escrow account, Lima's final paycheck has a net credit of $46 ($515 - $469 = $46) for training costs and Grace's final paycheck has a net deduction of $189 ($689 – $500 = $189) for training costs (which is well below the $350 deduction limit for Grace described herein). (Ex. 3 to Turner Dec. at 48 & Ex. 4 to Turner Dec. at 46.)

deductions from the pay of Plaintiffs or anyone else in a manner that resulted in a reduction to any overtime pay required by the FLSA. As such, Plaintiff have failed to offer any evidence to prove that there are any similarly situated employees with respect to the alleged unlawful deductions class.

### 2. Plaintiffs have failed to prove that they are similarly situated to the members of the alleged unlawful deductions class.

Given the absence of any common policy of deductions that caused any overtime violations with respect to Plaintiffs, there is no basis for finding that there are similarly situated employees with respect to the alleged unlawful deductions class. Plaintiffs have not presented any evidence that any deductions policy caused any FLSA violations, much less any widespread FLSA violations. However, even if the deductions policies at issue had somehow caused other employees to be deprived of overtime, Plaintiffs are not similarly situated to those employees because the policies did not cause Plaintiffs to lose any overtime pay, as set forth above. *See Thedford*, 2014 WL 5520954 at *12 (denying conditional certification where the "plaintiffs are not similarly situated to the proposed class" with regard to the alleged FLSA violation). Accordingly, Plaintiffs have failed to meet their burden of proof on the similarly situated prong.

Finally, as the deductions at issue are not *per se* improper, there is no commonality between the basis for Plaintiffs' claims and the potential claims of the proposed class. "For the plaintiffs to show they are similarly situated [] they must show *liability* on a class-wide basis." *Briggins v. Elwood TRI, Inc.*, 882 F. Supp. 2d 1256, 1267 (N.D. Ala. 2012) (emphasis in original). As there are no across-the-board violations, an individualized analysis of the pay of each member of the class would be required, which runs directly counter to purpose of collective treatment. *McAnally*, 2021 WL 2514169 at *4; *Hilley*, 2014 WL 1246364 at *17 (denying certification when

24

individualized consideration would be required of each employee's alleged unpaid or shaved time

claims). In particular, a determination would have to be made on an employee-by-employee, week-

by-week basis to determine whether any deductions were improper. "These individualized inquires

make the certification of a collective in this proceeding unwarranted." *Hart*, 2012 WL 6196035,

at \*5. As such, certification of the alleged unlawful deductions class should be denied.

## II.     The collectives proposed by Plaintiffs are overbroad.

The collectives proposed by Plaintiffs are vastly overbroad because: 1) they include

individuals whose claims are time-barred, and 2) they include individuals in job categories not

similarly situated to Plaintiffs.

### A.     The classes are overbroad because they include individuals whose claims are time-barred.

A cause of action for violation of the FLSA's overtime compensation requirements must

be brought within two years of the date of the claimed violation. 29 U.S.C. § 255(a). The statute

of limitations period may be extended to three years if there is evidence the violation was willful.

*Id.* For statute of limitations purposes, an FLSA action is not commenced until a written consent

is filed. *Id.* § 256(a).

Plaintiffs seek to send notice to individuals who worked for Ranger "since 2019." (Doc. 46

at 499.) Although Plaintiffs' request is ambiguous given that they do not provide a specific start

date to determine membership, any claim asserted by an individual whose employment with

Ranger ended more than three years prior to the date of any conditional certification order would

be time-barred. Indeed, "only a written consent to opt-in will toll the statute of limitations on an

opt-in plaintiff's cause of action." *Grayson*, 79 F.3d at 1106. As Plaintiff's proposed class

description includes individuals who worked for Ranger more than three years from the date any

opt-in notices could be filed, Plaintiffs seek to send notice to individuals whose FLSA claims are

time-barred. Any notice should only be sent to individuals who still have timely claims.[15]

### B.    The proposed collectives are overbroad because they include individuals with jobs different than Plaintiffs.

Plaintiffs' proposed collectives are too broad because they are not limited to employees

with the same job classifications that Plaintiffs held during their employment. During their

employment with Ranger, Lima was a Field Supervisor and Grace was a Field Technician.

Plaintiffs have not presented any evidence from anyone outside of those two job titles. However,

Plaintiffs argue that notice should issue to any hourly employee who was employed by Ranger

without regard to job classification or job duties. There is no legal or factual support for the breadth

of this class. Indeed, "[s]uch a broad class would almost inevitably include employees with very

different job titles and responsibilities, both of which are relevant factors in making the 'similarly

situated' determination." *Davis*, 303 F. Supp. 2d at 1278; *see also Reed*, 246 F. Supp. 2d at 1231

("With respect to job title, different jobs generally carry different responsibilities and often require

different hours of employment, undermining the similarity between the employees.").

The testimony of two plaintiffs does not provide a basis to conclude that every hourly

employee is similarly situated to them and should, therefore, be provided with notice of this action.

Other courts have rejected the "suggestion that, as a matter of law, every [hourly] employee is

necessarily similarly situated to every other [hourly] employee of the same employer." *Reed*, 246

F. Supp. 2d at 1231. Given the limited scope of the evidence they have presented, Plaintiffs have

failed to demonstrate "a reasonable basis for crediting [their] assertions that aggrieved individuals

---

[15] As such, if notice is issued, it should only be issued to individuals within the approved class who were employed by Ranger within the applicable statute of limitations measured backwards from the date of conditional certification.

exist in the broad class that [they] propose." *Haynes*, 696 F.2d at 887.

### III.   Notice should not be issued to individuals who signed arbitration agreements during their employment with Ranger.

If the court conditionally certifies a collective, notice should not issue to employees who signed an arbitration agreement with Ranger during their employment because they are not eligible to participate in this action as plaintiffs. Both the Fifth and Seventh Circuit have held that district courts may not authorize the issuance of notice to individuals who entered into valid arbitration agreements waiving their right to join the action. *See Bigger v. Facebook*, 947 F.3d 1043, 1050 (7th Cir. 2020); *In re: JPMorgan Chase & Company*, 916 F.3d 494, 501 (5th Cir. 2019). As the Fifth Circuit explained, district courts do not have the discretion "to send or require notice of a pending FLSA collective action to employees who are unable to join the action because of binding arbitration agreements." 916 F.3d at 504.  District courts in the Eleventh Circuit have heeded this admonition. *See, e.g., Mennucci*, 2021 WL 2603711 at *4 ("Employees who signed a binding arbitration agreement are not potential plaintiffs and should not receive notice of the lawsuit."); *McGuire v. Intelident Solutions, LLC*, 385 F. Supp. 3d 1261, 1265-66 (M.D. Fla. 2019) (finding that individuals who "may be subject to a valid arbitration agreement should be excluded from this collective action at this notice stage" because they are not "potential plaintiffs").

As part of their new hire paperwork, Ranger employees sign a Common Ground Dispute Resolution Agreement ("Agreement"), which includes a mutual arbitration provision.[16] (Turner Dec. at ¶ 14; Ex. 10 to Turner Dec.) Specifically, the Agreement provides that "[a]ll claims, controversies or other disputes" between Ranger and the employee that could otherwise be

---

[16] Plaintiffs signed the Agreement at the beginning of their employment. (Lima Dep. at 21:2 to 22:1; Ex. 5 to Lima Dep., Grace Dep. at 23:10-22, Ex. 18 to Grace Dep.) Ranger has not sought to enforce the Agreement with respect to Plaintiffs' individual claims.

resolved by a court shall (unless specifically excluded by the Agreement) "be resolved through the Program and both the Company and the Employee expressly waive any right to resolve any Covered Dispute through any other means. Neither the Company nor an Employee will be able to sue in court in connection with a Covered Dispute." (Ex. 10 to Turner Dec. at 1.) FLSA claims are specifically included within the list of Covered Disputes in the Agreement. (*Id.*) If a dispute is not voluntarily resolved between the parties, "either party pay elect to proceed to binding arbitration" through the American Arbitration Association. (*Id.* at 2.)

The Agreement includes a collective action waiver. Specifically, it provides that "Covered Disputes pertaining to different employee shall be heard in different proceedings. The arbitrator or arbitrators shall have no power to consolidate Covered Disputes of different employees or to hear any class action." (*Id.*) The Eleventh Circuit had made clear that a provision in an arbitration agreement waiving the ability to bring a collective action is enforceable under the Federal Arbitration Act ("FAA"). *See Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1334 (11th Cir. 2014) (enforcing collective action waiver in FLSA case).

The FAA mandates the arbitration of claims when there is a "'written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract.'" *Aldred v. Avis Rent-A-Car*, 247 F. App'x 167, 169 (11th Cir. 2007) (quoting 9 U.S.C. § 2). The prerequisites to enforceability have been met with respect to the Agreement. As an initial matter, the Arbitration Agreement is written and is signed by the employee during the new hire paperwork process. In addition, FLSA claims expressly fail within the scope of the Agreement.

Moreover, it is undisputed that Ranger's business involves interstate commerce. The

United States Supreme Court has broadly applied the term "interstate commerce" in defining the scope of the FAA, extending its reach to the full limits of Congress's commerce clause power. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 268 (1995). As such, "if an organization engages in business across state lines, has any portion of its assets generated as a result of activity across state lines, or engages in any business that may be regulated by the Congress pursuant to powers granted in the Commerce Clause, then FAA jurisdiction is the appropriate mechanism for settling a dispute where a valid arbitration agreement has been executed." *Maddox v. USA Healthcare-Adams, LLC*, 350 F. Supp. 2d 968, 974 (M.D. Ala. 2004). Ranger's employees travel across state lines as part of the company's business. (Lima Dep. at 35:9-22, 36:22 to 37:6; Grace Dep. at 28:11-14.) Indeed, it is undisputed that Ranger is engaged in interstate commerce because it receives equipment and materials from out-of-state and its employees perform services in states other than Alabama. (Doc. 47 at 2 ¶ 9.) Accordingly, all of the requirements for enforceability under the FAA have been met.[17]

As such, given that individuals who signed the above-referenced arbitration agreement are not eligible to join this lawsuit, they should not receive any notice if a collective is certified. If Plaintiffs have any dispute regarding the existence or validity of the arbitration agreements, the court should permit defendant to submit "additional evidence" on the agreement's existence and validity, in accordance with the procedure specified in *Bigger* and *JPMorgan*. *See Bigger*, 947 F.3d at 1050; *In re: JPMorgan*, 916 F.3d at 494.

---

[17] Moreover, the Agreement is supported by consideration because it applies to both Ranger and the employee. *See Wright v. Circuit City Stores, Inc.*, 82 F. Supp. 2d 1279, 1284 (N.D. Ala. 2000) (finding consideration existed by virtue of mutuality of agreement to arbitrate claims).

IV.     **Any opt-in period should be limited to 60 days.**

If the court conditionally certifies a collective, the opt-in period should be limited to 60 days, not the 90 days proposed by Plaintiffs. Plaintiffs have not provided sufficient justification for a lengthy 90-day period. Courts have recognized that 60 days is a reasonable and sufficient period to make class members aware of their rights to opt-in. *See, e.g., Sellers v. Sage Software, Inc.*, No. 1:17-cv-3614, 2018 WL 5631106, at *6 (N.D. Ga. May 25. 2018); *Robinson v. Ryla Teleservices, Inc.*, No. CA 11-131-KD-C, 2011 WL 6667338, at *4 (S.D. Ala. Dec. 21, 2011). Accordingly, Defendant requests that any opt-in period be limited to 60 days.

V.      **Plaintiffs have failed to provide a proposed notice form to be sent to members of the proposed collectives.**

If a collective action is conditionally certified, the court must ensure that any opt-in notices that are issued to potential members are accurate and balanced. *See Hoffman-La Roche*, 493 U.S. at 169-70. "In the exercise of its discretion, the court should screen the proposed notice to prevent potential plaintiffs from receiving information which is 'factually inaccurate, unbalanced, or misleading." *Earle v. Convergent Outsourcing, Inc.,* No. 2:12-cv-1050-WKW, 2013 WL 6252422, at *5 (M.D. Ala. Sept. 5, 2013).

While Plaintiff's Motion references "proposed notice" forms as an exhibit, there are no proposed notice forms in Plaintiffs' filing. Rather, Plaintiffs' filing includes the proposed "consent to join" forms, but not any proposed notice forms. As it is Plaintiffs' responsibility to provide the proposed notice forms for the court's review and approval, Plaintiff's Motion should be denied based on their failure to do so. However, if Plaintiffs are given an opportunity to file a proposed notice, Defendant should be allowed to file objections to any such form before the Court issues a decision.

Respectfully submitted,

_/s/Joshua S. Thompson_
Carter H. Dukes
Wes Stevenson
Joshua S. Thompson
Attorneys for Defendant Ranger
Environmental Services, LLC

**OF COUNSEL:**
SCOTT DUKES & GEISLER, P.C.
211 22nd Street North
Birmingham, Alabama 35203
Telephone:(205) 251-2300
Facsimile: (205) 251-6773
Email: cdukes@scottdukeslaw.com
      jthompson@scottdukeslaw.com
      wstevenson@scottdukeslaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 14, 2022, I filed the foregoing using the CM/ECF electronic filing system which will send notification to the following counsel of record:

Jody Forester Jackson, Esq.
Jackson and Jackson
2100 Southbridge Pkwy
Suite 650
Birmingham, Alabama 35209

Mary Bubbett Jackson, Esq.
Jackson and Jackson
201 St. Charles Ave.
Suite 2500
New Orleans, Louisiana 70170
_Admitted pro hac vice_

_/s/ Joshua S. Thompson_
Of Counsel

31